(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KAHLER *v.* KANSAS

### CERTIORARI TO THE SUPREME COURT OF KANSAS

No. 18–6135.　Argued October 7, 2019—Decided March 23, 2020

In *Clark* v. *Arizona*, 548 U. S. 735, this Court catalogued the diverse strains of the insanity defense that States have adopted to absolve mentally ill defendants of criminal culpability. Two—the cognitive and moral incapacity tests—appear as alternative pathways to acquittal in the landmark English ruling *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718. The moral incapacity test asks whether a defendant's illness left him unable to distinguish right from wrong with respect to his criminal conduct. Respondent Kansas has adopted the cognitive incapacity test, which examines whether a defendant was able to understand what he was doing when he committed a crime. Specifically, under Kansas law a defendant may raise mental illness to show that he "lacked the culpable mental state required as an element of the offense charged," Kan. Stat. Ann §21–5209. Kansas does not recognize any additional way that mental illness can produce an acquittal, although a defendant may use evidence of mental illness to argue for a lessened punishment at sentencing. See §§21– 6815(c)(1)(C), 21–6625(a). In particular, Kansas does not recognize a moral-incapacity defense.

　Kansas charged petitioner James Kahler with capital murder after he shot and killed four family members. Prior to trial, he argued that Kansas's insanity defense violates due process because it permits the State to convict a defendant whose mental illness prevented him from distinguishing right from wrong. The court disagreed and the jury returned a conviction. During the penalty phase, Kahler was free to raise any argument he wished that mental illness should mitigate his sentence, but the jury still imposed the death penalty. The Kansas Supreme Court rejected Kahler's due process argument on appeal.

*Held*: Due process does not require Kansas to adopt an insanity test that turns on a defendant's ability to recognize that his crime was morally

wrong.  Pp. 6–24.

(a) A state rule about criminal liability violates due process only if it "offends some principle of justice so rooted in the traditions and conscience our people as to be ranked as fundamental." *Leland* v. *Oregon*, 343 U. S. 790, 798 (internal quotation marks omitted).  History is the primary guide for this analysis.  The due process standard sets a high bar, and a rule of criminal responsibility is unlikely to be sufficiently entrenched to bind all States to a single approach.  As the Court explained in *Powell* v. *Texas*, 392 U. S. 514, the scope of criminal responsibility is animated by complex and ever-changing ideas that are best left to the States to evaluate and reevaluate over time.  This principle applies with particular force in the context of the insanity defense, which also involves evolving understandings of mental illness.  This Court has thus twice declined to constitutionalize a particular version of the insanity defense, see *Leland*, 343 U. S. 790; *Clark*, 548 U. S. 735, holding instead that a State's "insanity rule[ ] is substantially open to state choice," *id.,* at 752.  Pp. 6–9.

(b)  Against this backdrop, Kahler argues that Kansas has abolished the insanity defense—and, in particular, that it has impermissibly jettisoned the moral-incapacity approach.  As a starting point, Kahler is correct that for hundreds of years jurists and judges have recognized that insanity can relieve criminal responsibility.  But Kansas recognizes the same: Under Kansas law, mental illness is a defense to culpability if it prevented a defendant from forming the requisite criminal intent; a defendant is permitted to offer whatever evidence of mental health he deems relevant at sentencing; and a judge has discretion to replace a defendant's prison term with commitment to a mental health facility.

So Kahler can prevail only by showing that due process requires States to adopt a specific test of insanity—namely, the moral-incapacity test.  He cannot do so.  Taken as a whole, the early common law cases and commentaries reveal no settled consensus favoring Kahler's preferred right-from-wrong rule.  Even after *M'Naghten* gained popularity in the 19th century, States continued to experiment with new approaches.  *Clark* therefore declared: "History shows no deference to *M'Naghten* that could elevate its formula to the level of fundamental principle."  548 U. S., at 749–752.  The tapestry of approaches States have adopted shows that no single version of the insanity defense has become so ingrained in American law as to rank as "fundamental."  *Id*., at 749.

This result is not surprising.  *Ibid.*  The insanity defense sits at the juncture of medical views of mental illness and moral and legal theories of criminal culpability—two areas of conflict and change.  Small

Syllabus

wonder that no particular test of insanity has developed into a constitutional baseline.  And it is not for the courts to insist on any single criterion moving forward.  Defining the precise relationship between criminal culpability and mental illness requires balancing complex considerations, among them the workings of the brain, the purposes of criminal law, and the ideas of free will and responsibility.  This balance should remain open to revision as new medical knowledge emerges and societal norms evolve.  Thus—as the Court recognized previously in *Leland*, *Powell*, and *Clark*—the defense is a project for state governance, not constitutional law.  Pp. 10–24.

307 Kan. 374, 410 P. 3d 105, affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined.  BREYER, J., filed a dissenting opinion, in which GINSBURG and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–6135

## JAMES K. KAHLER, PETITIONER *v.* KANSAS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[March 23, 2020]

JUSTICE KAGAN delivered the opinion of the Court.

This case is about Kansas's treatment of a criminal de-
fendant's insanity claim. In Kansas, a defendant can in-
voke mental illness to show that he lacked the requisite
*mens rea* (intent) for a crime. He can also raise mental ill-
ness after conviction to justify either a reduced term of im-
prisonment or commitment to a mental health facility. But
Kansas, unlike many States, will not wholly exonerate a de-
fendant on the ground that his illness prevented him from
recognizing his criminal act as morally wrong. The issue
here is whether the Constitution's Due Process Clause
forces Kansas to do so—otherwise said, whether that
Clause compels the acquittal of any defendant who, because
of mental illness, could not tell right from wrong when com-
mitting his crime. We hold that the Clause imposes no such
requirement.

I

A

In *Clark* v. *Arizona*, 548 U. S. 735, 749 (2006), this Court
catalogued state insanity defenses, counting four "strains
variously combined to yield a diversity of American stand-
ards" for when to absolve mentally ill defendants of crimi-
nal culpability. The first strain asks about a defendant's

"cognitive capacity"—whether a mental illness left him "unable to understand what he [was] doing" when he committed a crime. *Id.*, at 747, 749. The second examines his "moral capacity"—whether his illness rendered him "unable to understand that his action [was] wrong." *Ibid.* Those two inquiries, *Clark* explained, appeared as alternative pathways to acquittal in the landmark English ruling *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (H. L. 1843), as well as in many follow-on American decisions and statutes: If the defendant lacks either cognitive or moral capacity, he is not criminally responsible for his behavior. Yet a third "building block[]" of state insanity tests, gaining popularity from the mid-19th century on, focuses on "volitional incapacity"—whether a defendant's mental illness made him subject to "irresistible[] impulse[s]" or otherwise unable to "control[] his actions." *Clark*, 548 U. S., at 749, 750, n. 11; see, *e.g.*, *Parsons* v. *State*, 81 Ala. 577, 597, 2 So. 854, 866–867 (1887). And bringing up the rear, in *Clark*'s narration, the "product-of-mental-illness test" broadly considers whether the defendant's criminal act stemmed from a mental disease. 548 U. S., at 749–750.

As *Clark* explained, even that taxonomy fails to capture the field's complexity. See *id.*, at 750, n. 11. Most notable here, *M'Naghten*'s "moral capacity" prong later produced a spinoff, adopted in many States, that does not refer to morality at all. Instead of examining whether a mentally ill defendant could grasp that his act was *immoral*, some jurisdictions took to asking whether the defendant could understand that his act was *illegal*. Compare, *e.g.*, *People* v. *Schmidt*, 216 N. Y. 324, 333–334, 110 N. E. 945, 947 (1915) (Cardozo, J.) (asking about moral right and wrong), with, *e.g.*, *State* v. *Hamann*, 285 N. W. 2d 180, 183 (Iowa 1979) (substituting ideas of legal right and wrong). That change in legal standard matters when a mentally ill defendant knew that his act violated the law yet believed it morally justified. See, *e.g.*, *Schmidt*, 216 N. Y., at 339, 110 N. E., at

949; *People* v. *Serravo*, 823 P. 2d 128, 135 (Colo. 1992).[1]

Kansas law provides that "[i]t shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the culpable mental state required as an element of the offense charged." Kan. Stat. Ann. §21–5209 (2018 Cum. Supp.).[2] Under that statute, a defendant may introduce any evidence of any mental illness to show that he did not have the intent needed to commit the charged crime. Suppose, for example, that the defendant shot someone dead and goes on trial for murder. He may then offer psychiatric testimony that he did not understand the function of a gun or the consequences of its use—more generally stated, "the nature and quality" of his actions. *M'Naghten*, 10 Cl. & Fin., at 210, 8 Eng. Rep., at 722. And a jury crediting that testimony must acquit him. As everyone here agrees, Kansas law thus uses *M'Naghten*'s "cognitive capacity" prong—the inquiry into whether a mentally ill defendant could comprehend what he was doing when he committed a crime. See Brief for Petitioner 41; Brief for Respondent 31; Brief for United States as *Amicus Curiae* 18. If the defendant had no such capacity, he could not form the requisite intent—and thus is not criminally responsible.

At the same time, the Kansas statute provides that "[m]ental disease or defect is not otherwise a defense." §21–5209. In other words, Kansas does not recognize any additional way that mental illness can produce an acquittal.[3]

————————

[1] Another complicating factor in *Clark*'s classification scheme is that States "limit, in varying degrees, which sorts of mental illness" can support an insanity claim. *Clark* v. *Arizona*, 548 U. S. 735, 750, n. 11 (2006). So even two States using the same test for judging culpability may apply it to differently sized sets of offenders. See *infra*, at 21, n. 11.

[2] At the time of the crime in this case, a materially identical provision was codified at §22–3220 (2007).

[3] Four other States similarly exonerate a mentally ill defendant only when he cannot understand the nature of his actions and so cannot form the requisite *mens rea*. See Alaska Stat. §§12.47.010(a), 12.47.020

Most important for this case, a defendant's moral incapacity cannot exonerate him, as it would if Kansas had adopted *both* original prongs of *M'Naghten*. Assume, for example, that a defendant killed someone because of an "insane delusion that God ha[d] ordained the sacrifice." *Schmidt*, 216 N. Y., at 339, 110 N. E., at 949. The defendant knew what he was doing (killing another person), but he could not tell moral right from wrong; indeed, he thought the murder morally justified. In many States, that fact would preclude a criminal conviction, although it would almost always lead to commitment in a mental health facility. In Kansas, by contrast, evidence of a mentally ill defendant's moral incapacity—or indeed, of anything except his cognitive inability to form the needed *mens rea*—can play no role in determining guilt.

That partly closed-door policy changes once a verdict is in. At the sentencing phase, a Kansas defendant has wide latitude to raise his mental illness as a reason to judge him not fully culpable and so to lessen his punishment. See §§21–6815(c)(1)(C), 21–6625(a). He may present evidence (of the kind *M'Naghten* deemed relevant) that his disease made him unable to understand his act's moral wrongness—as in the example just given of religious delusion. See §21–6625(a). Or he may try to show (in line with *M'Naghten*'s spinoff ) that the illness prevented him from "appreciat[ing] the [conduct's] criminality." §21–6625(a)(6). Or again, he may offer testimony (here invoking volitional incapacity) that he simply could not "conform [his] conduct" to legal restraints. *Ibid.* Kansas sentencing law thus provides for an individualized determination of how mental illness, in any or all of its aspects, affects culpability. And the same kind of evidence can persuade a court to place a defendant who needs psychiatric care in a

––––––––––

(2018); Idaho Code Ann. §§18–207(1), (3) (2016); Mont. Code Ann. §46–14–102 (2019); Utah Code §76–2–305 (2017).

mental health facility rather than a prison. See §22–3430. In that way, a defendant in Kansas lacking, say, moral capacity may wind up in the same kind of institution as a like defendant in a State that would bar his conviction.

## B

This case arises from a terrible crime. In early 2009, Karen Kahler filed for divorce from James Kahler and moved out of their home with their two teenage daughters and 9-year-old son. Over the following months, James Kahler became more and more distraught. On Thanksgiving weekend, he drove to the home of Karen's grandmother, where he knew his family was staying. Kahler entered through the back door and saw Karen and his son. He shot Karen twice, while allowing his son to flee the house. He then moved through the residence, shooting Karen's grandmother and each of his daughters in turn. All four of his victims died. Kahler surrendered to the police the next day and was charged with capital murder.

Before trial, Kahler filed a motion arguing that Kansas's treatment of insanity claims violates the Fourteenth Amendment's Due Process Clause. Kansas, he asserted, had "unconstitutionally abolished the insanity defense" by allowing the conviction of a mentally ill person "who cannot tell the difference between right and wrong." App. 11–12. The trial court denied the motion, leaving Kahler to attempt to show through psychiatric and other testimony that severe depression had prevented him from forming the intent to kill. See *id.*, at 16; §21–5209. The jury convicted Kahler of capital murder. At the penalty phase, the court permitted Kahler to offer additional evidence of his mental illness and to argue in whatever way he liked that it should mitigate his sentence. The jury still decided to impose the death penalty.

Kahler appealed, again challenging the constitutionality

of Kansas's approach to insanity claims. The Kansas Supreme Court rejected his argument, relying on an earlier precedential decision. See 307 Kan. 374, 400–401, 410 P. 3d 105, 124–125 (2018) (discussing *State* v. *Bethel*, 275 Kan. 456, 66 P. 3d 840 (2003)). There, the court denied that any single version of the insanity defense is so "ingrained in our legal system" as to count as "fundamental." *Id.*, at 473, 66 P. 3d, at 851. The court thus found that "[d]ue process does not mandate that a State adopt a particular insanity test." *Ibid.*

Kahler then asked this Court to decide whether the Due Process Clause requires States to provide an insanity defense that acquits a defendant who could not "distinguish right from wrong" when committing his crime—or, otherwise put, whether that Clause requires States to adopt the moral-incapacity test from *M'Naghten.* Pet. for Cert. 18. We granted certiorari, 586 U. S. ___ (2019), and now hold it does not.[4]

## II

### A

A challenge like Kahler's must surmount a high bar. Under well-settled precedent, a state rule about criminal liability—laying out either the elements of or the defenses to a crime—violates due process only if it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Leland* v. *Oregon*, 343 U. S. 790, 798 (1952) (internal quotation marks omitted). Our primary guide in applying that standard is "historical practice." *Montana* v. *Egelhoff*, 518 U. S. 37, 43 (1996) (plurality opinion). And in assessing that practice,

---

[4] Kahler also asked us to decide whether the Eighth Amendment requires that States make available the moral-incapacity defense. See Pet. for Cert. 18. But that claim is not properly before us. Kahler did not raise the argument below, and the Kansas courts therefore did not address it.

we look primarily to eminent common-law authorities (Blackstone, Coke, Hale, and the like), as well as to early English and American judicial decisions. See, *e.g.*, *id.*, at 44–45; *Patterson* v. *New York*, 432 U. S. 197, 202 (1977). The question is whether a rule of criminal responsibility is so old and venerable—so entrenched in the central values of our legal system—as to prevent a State from ever choosing another. An affirmative answer, though not unheard of, is rare. See, *e.g.*, *Clark*, 548 U. S., at 752 ("[T]he conceptualization of criminal offenses" is mostly left to the States).

In *Powell* v. *Texas*, 392 U. S. 514 (1968), this Court explained why. There, Texas declined to recognize "chronic alcoholism" as a defense to the crime of public drunkenness. *Id.*, at 517 (plurality opinion). The Court upheld that decision, emphasizing the paramount role of the States in setting "standards of criminal responsibility." *Id.*, at 533. In refusing to impose "a constitutional doctrine" defining those standards, the Court invoked the many "interlocking and overlapping concepts" that the law uses to assess when a person should be held criminally accountable for "his antisocial deeds." *Id.*, at 535–536. "The doctrines of *actus reus*, *mens rea*, insanity, mistake, justification, and duress"—the Court counted them off—reflect both the "evolving aims of the criminal law" and the "changing religious, moral, philosophical, and medical views of the nature of man." *Id.*, at 536. Or said a bit differently, crafting those doctrines involves balancing and rebalancing over time complex and oft-competing ideas about "social policy" and "moral culpability"—about the criminal law's "practical effectiveness" and its "ethical foundations." *Id.*, at 538, 545, 548 (Black, J., concurring). That "constantly shifting adjustment" could not proceed in the face of rigid "[c]onstitution[al] formulas." *Id.*, at 536–537 (plurality opinion). Within broad limits, *Powell* thus concluded, "doctrine[s] of criminal responsibility" must remain "the province of the States." *Id.*, at 534, 536.

Nowhere has the Court hewed more closely to that view than in addressing the contours of the insanity defense. Here, uncertainties about the human mind loom large. See, *e.g.*, *Ake* v. *Oklahoma*, 470 U. S. 68, 81 (1985) ("[P]sychiatrists disagree widely and frequently on what constitutes mental illness, on [proper] diagnos[es, and] on cure and treatment"). Even as some puzzles get resolved, others emerge. And those perennial gaps in knowledge intersect with differing opinions about how far, and in what ways, mental illness should excuse criminal conduct. See *Clark*, 548 U. S., at 749–752 (canvassing how those competing views produced a wealth of insanity tests); *supra*, at 1–2. "This whole problem," we have noted, "has evoked wide disagreement." *Leland*, 343 U. S., at 801. On such unsettled ground, we have hesitated to reduce "experimentation, and freeze [the] dialogue between law and psychiatry into a rigid constitutional mold." *Powell*, 392 U. S., at 536–537. Indeed, while addressing the demand for an alcoholism defense in *Powell*, the Court pronounced—as something close to self-evident—that "[n]othing could be less fruitful" than to define a specific "insanity test in constitutional terms." *Id.*, at 536.

And twice before we have declined to do so. In *Leland* v. *Oregon*, a criminal defendant challenged as a violation of due process the State's use of the moral-incapacity test of insanity—the very test Kahler now asks us to require. See 343 U. S., at 800–801. According to the defendant, Oregon instead had to adopt the volitional-incapacity (or irresistible-impulse) test to comply with the Constitution. See *ibid.*; *supra*, at 2. We rejected that argument. "[P]sychiatry," we first noted, "has made tremendous strides since [the moral-incapacity] test was laid down in *M'Naghten's Case*," implying that the test seemed a tad outdated. 343 U. S., at 800–801. But still, we reasoned, "the progress of science has not reached a point where its learning" would demand "eliminat[ing] the right and wrong test from [the] criminal law."

*Id.*, at 801. And anyway, we continued, the "choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy" about when mental illness should absolve someone of "criminal responsibility." *Ibid.* The matter was thus best left to each State to decide on its own. The dissent agreed (while parting from the majority on another ground): "[I]t would be indefensible to impose upon the States[] one test rather than another for determining criminal culpability" for the mentally ill, "and thereby to displace a State's own choice." *Id.*, at 803 (opinion of Frankfurter, J.).

A half-century later, we reasoned similarly in *Clark*. There, the defendant objected to Arizona's decision to discard the cognitive-incapacity prong of *M'Naghten* and leave in place only the moral-incapacity one—essentially the flipside of what Kansas has done. Again, we saw no due process problem. Many States, we acknowledged, allowed a defendant to show insanity through either prong of *M'Naghten*. See 548 U. S., at 750. But we denied that this approach "represents the minimum that a government must provide." *Id.*, at 748. In so doing, we invoked the States' traditional "capacity to define crimes and defenses," and noted how views of mental illness had been particularly "subject to flux and disagreement." *Id.*, at 749, 752. And then we surveyed the disparate ways that state laws had historically excused criminal conduct because of mental disease—those "strains variously combined to yield a diversity of American standards." See *id.*, at 749–752; *supra*, at 1–2. The takeaway was "clear": A State's "insanity rule[] is substantially open to state choice." *Clark*, 548 U. S., at 752. Reiterating *Powell*'s statement, *Clark* held that "no particular" insanity test serves as "a baseline for due process." 548 U. S., at 752. Or said just a bit differently, that "due process imposes no single canonical formulation of legal insanity." *Id.*, at 753.

B

Yet Kahler maintains that Kansas's treatment of insanity fails to satisfy due process. He sometimes makes his argument in the broadest of strokes, as he did before trial. See *supra*, at 5. Kansas, he then contends, has altogether "abolished the insanity defense," in disregard of hundreds of years of historical practice. Brief for Petitioner 39. His central claim, though, is more confined. It is that Kansas has impermissibly jettisoned the moral-incapacity test for insanity. See *id.*, at 12, 23. As earlier noted, both *Clark* and *Leland* described that test as coming from *M'Naghten*. See 548 U. S., at 749; 343 U. S., at 801; *supra*, at 2, 8. But according to Kahler (and the dissent), the moral-incapacity inquiry emerged centuries before that decision, thus forming part of the English common-law heritage this country inherited. See Brief for Petitioner 21, 42; *post*, at 4–14 (opinion of BREYER, J.). And the test, he claims, served for all that time—and continuing into the present—as the touchstone of legal insanity: If a defendant could not understand that his act was morally wrong, then he could not be found criminally liable. See Brief for Petitioner 20–23; see also *post*, at 15. So Kahler concludes that the moral-incapacity standard is a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Leland*, 343 U. S., at 798; see *supra*, at 6. In essence—and contra *Clark*—that test *is* the "single canonical formulation of legal insanity" and thus the irreducible "baseline for due process." 548 U. S., at 752–753; see *supra*, at 9.[5]

_____

[5] Although the dissent at times claims to the contrary, its argument is the same. Given the clear direction of our precedent, the dissent must purport to grant the States "leeway" in defining legal insanity. *Post*, at 1. But the entirety of the dissent's historical analysis focuses on the moral-incapacity standard—attempting to show, just as Kahler does, that it both preceded and succeeded *M'Naghten*. See *post*, at 4–17. And in line with that narration, the dissent insists on moral understanding

One point, first, of agreement: Kahler is right that for hundreds of years jurists and judges have recognized insanity (however defined) as relieving responsibility for a crime. "In criminal cases therefore," Sir William Blackstone wrote, "lunatics are not chargeable for their own acts, if committed when under these incapacities." 4 Commentaries on the Laws of England 24 (1769). Sir Edward Coke even earlier explained that in criminal cases, "the act and wrong of a mad man shall not be imputed to him." 2 Institutes of the Laws of England §405, p. 247b (1628) (Coke). And so too Henry de Bracton thought that a "madman" could no sooner be found criminally liable than a child. 2 Bracton on Laws and Customs of England 384 (S. Thorne transl. 1968) (Bracton). That principle of non-culpability appeared in case after case involving allegedly insane defendants, on both sides of the Atlantic. "The defense of insanity[] is a defense for all crimes[,] from the highest to the lowest," said the Court in Old Bailey. *Trial of Samuel Burt* (July 19, 1786), in 6 Proceedings in the Old Bailey 874 (E. Hodgson ed. 1788) (Old Bailey Proceedings). Repeated Justice Story, when riding circuit: "In general, insanity is an excuse for the commission of every crime, because the party has not the possession of that reason, which includes responsibility." *United States* v. *Drew*, 25 F. Cas. 913 (No. 14,993) (CC Mass. 1828); see also, *e.g.*, *State* v. *Marler*, 2 Ala. 43, 49 (1841) ("If the prisoner was insane, he was not an accountable being"); *Cornwell* v. *State*, 8 Tenn. 147, 156 (1827) ("[P]erfect madness" will "free a man from punishment for crime"). We have not found a single case to the contrary.

_____

as the indispensable criterion of legal sanity—the *sine qua non* of criminal responsibility. See, *e.g.*, *post*, at 1, 3–4, 8–9, 18–21. Indeed, the dissent offers only one way the States have actual "leeway" to change their insanity rules: They can "*expand* upon *M'Naghten*'s principles" by finding that even some who *have* moral capacity are insane. *Post*, at 22. But that is just to say that moral capacity is the constitutional floor—again, exactly what Kahler argues.

But neither do we think Kansas departs from that broad principle. First, Kansas has an insanity defense negating criminal liability—even though not the type Kahler demands. As noted earlier, Kansas law provides that it is "a defense to a prosecution" that "the defendant, as a result of mental disease or defect, lacked the culpable mental state required" for a crime. §21–5209; see *supra*, at 3. That provision enables a defendant to present psychiatric and other evidence of mental illness to defend himself against a criminal charge. More specifically, the defendant can use that evidence to show that his illness left him without the cognitive capacity to form the requisite intent. See *supra*, at 3. Recall that such a defense was exactly what the defendant in *Clark* wanted, in preference to Arizona's moral-incapacity defense: His (unsuccessful) appeal rested on the trial court's exclusion of psychiatric testimony to show that he lacked the relevant *mens rea*. See 548 U. S., at 745–747; *supra*, at 9. Here, Kahler could do what Clark could not—try to show through such testimony that he had no intent to kill. Of course, Kahler would have preferred Arizona's kind of insanity defense (just as Clark would have liked Kansas's). But that does not mean that Kansas (any more than Arizona) failed to offer any insanity defense at all.

Second, and significantly, Kansas permits a defendant to offer whatever mental health evidence he deems relevant at sentencing. See §§21–6815(c)(1)(C), 21–6625(a); *supra*, at 4. A mentally ill defendant may argue there that he is not blameworthy because he could not tell the difference between right and wrong. Or, because he did not know his conduct broke the law. Or, because he could not control his behavior. Or, because of anything else. In other words, any manifestation of mental illness that Kansas's guilt-phase insanity defense disregards—including the moral incapacity Kahler highlights—can come in later to mitigate culpability and lessen punishment. And that same kind of evidence can persuade a judge to replace any prison term with

commitment to a mental health facility. See §22–3430; *supra*, at 4–5. So as noted above, a defendant arguing moral incapacity may well receive the same treatment in Kansas as in States that would acquit—and, almost certainly, commit—him for that reason. See *supra*, at 4–5. In sum, Kansas does not bar, but only channels to sentencing, the mental health evidence that falls outside its intent-based insanity defense. When combined with Kansas's allowance of mental health evidence to show a defendant's inability to form criminal intent, that sentencing regime defeats Kahler's charge that the State has "abolish[ed] the insanity defense entirely."[6] Brief for Petitioner 39.

So Kahler can prevail here only if he can show (again, contra *Clark*) that due process demands a specific test of legal insanity—namely, whether mental illness prevented a defendant from understanding his act as immoral. Kansas, as we have explained, does not use that type of insanity rule. See *supra*, at 3–4. If a mentally ill defendant had enough cognitive function to form the intent to kill, Kansas law directs a conviction even if he believed the murder morally justified. In Kansas's judgment, that delusion does not make an intentional killer entirely blameless. See Brief for Respondent 40. Rather than eliminate, it only lessens the defendant's moral culpability. See *ibid.* And sentencing is the appropriate place to consider mitigation: The decisionmaker there can make a nuanced evaluation of blame, rather than choose, as a trial jury must, between all and nothing. See *ibid.* In any event, so Kansas thinks.[7] Those

——————

[6] We here conclude only that Kansas's scheme does not abolish the insanity defense. We say nothing, one way or the other, about whether any other scheme might do so.

[7] The dissent is therefore wrong to suggest that Kansas's law has become untethered from moral judgments about culpability. See *post*, at 1, 3, 16–22. No doubt, Kansas's moral judgments differ from the dissent's. Again, Kansas believes that an intentional killer is not wholly blameless, even if, for example, he thought his actions commanded by God. The dissent, in contrast, considers Kansas's view benighted (as maybe some

views are contested and contestable; other States—many others—have made a different choice. But Kahler must show more than that. He must show that adopting the moral-incapacity version of the insanity rule is not a choice at all—because, again, that version is "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Leland*, 343 U. S., at 798. And he cannot. The historical record is, on any fair reading, complex—even messy. As we will detail, it reveals early versions of not only Kahler's proposed standard but also Kansas's alternative.

Early commentators on the common law proposed various formulations of the insanity defense, with some favoring a morality inquiry and others a *mens rea* approach. Kahler cites William Lambard's 16th-century treatise defining a "mad man" as one who "hath no knowledge of good nor evil" (the right and wrong of the day). Eirenarcha, ch. 21, p. 218 (1581). He likewise points to William Hawkins's statement, over a hundred years later, that a "lunatick[]" is not punishable because "under a natural disability of distinguishing between good and evil." 1 Pleas of the Crown §1, p. 2 (1716) (capitalization omitted). Both true enough. But other early versions of the insanity test—and from a more famous trio of jurists—demanded the kind of cognitive

---

in the majority do too). But that is not a dispute, as the dissent suggests, about *whether* morality should play a role in assigning legal responsibility. It is instead a disagreement about what morality entails—that is, about *when* a defendant is morally culpable for an act like murder. See *State* v. *Bethel*, 275 Kan. 456, 465–471, 66 P. 3d 840, 847–850 (2003) (accepting Kansas's view that "moral blameworthiness" is linked to a defendant's intent to kill, rather than to his ability to tell right from wrong). And we have made clear, from *Leland* to *Powell* to *Clark*, that courts do not get to make such judgments. See *supra*, at 7–9. Instead, the States have broad discretion to decide who counts as blameworthy, and to weigh that along with other factors in defining the elements of, and defenses to, crimes.

impairment that prevented a defendant from understanding the nature of his acts, and thus intending his crime. Henry de Bracton's 13th-century treatise gave rise to what became known as the "wild beast" test. See J. Biggs, The Guilty Mind 82 (1955). Used for hundreds of years, it likened a "madman" to an "animal[] which lack[s] reason" and so could not have "the intention to injure." Bracton 384; see *ibid.* (A "madman" cannot commit a crime because "[i]t is will and purpose which mark" misdeeds). Sir Edward Coke similarly linked the definition of insanity to a defendant's inability to form criminal intent. He described a legally insane person in 1628 as so utterly "without his mind or discretion" that he could not have the needed *mens rea.* 2 Coke §405, at 247b. So too Lord Matthew Hale a century later. He explained that insanity involves "a total alienation of the mind or perfect madness," such that a defendant could not act "*animo felonico,*" meaning with felonious intent. 1 Pleas of the Crown, ch. 4, pp. 30, 37 (1736); see *id.*, at 37 ("[F]or being under a full alienation of mind, he acts not per *electionem* or *intentionem* [by choice or intent]").[8]

—————————

[8] The dissent tries to recruit these three jurists to the side of the moral-incapacity test, see *post*, at 5–7, but cannot succeed. Even the carefully curated passages the dissent quotes focus on cognitive capability rather than moral judgment. See, *e.g.*, *post*, at 5–6 (asking whether a defendant had "sense and reason" or "understanding and liberty of will"). In so doing, they refer to the defendant's ability to form the requisite *mens rea*, or felonious intent. See *Clark*, 548 U. S., at 747; *supra*, at 1–3.

The dissent still insists all is not lost because (it says) *mens rea* itself hinged at common law on a defendant's "moral understanding." *Post*, at 8–9. Here, the dissent infers from the use of "good-from-evil" language in various common-law treatises and cases that moral blameworthiness must have defined the *mens rea* inquiry. See *ibid.* But to begin with— and to repeat the point made in the text—the most influential treatises used little of that language, emphasizing instead the need for a defendant to intend his act in the ordinary sense of the term. And as we will explain, the joint presence of references to *mens rea* and moral understanding in other common-law sources involving insanity does not show that most jurists saw the two concepts as one and the same. See *infra*,

Quite a few of the old common-law cases similarly stressed the issue of cognitive capacity. To be sure, even these cases included some references to the ability to tell right from wrong (and the dissent eagerly cherry-picks every one of them). But the decisions' overall focus was less on whether a defendant thought his act moral than on whether he had the ability to do much thinking at all. In the canonical case of *Rex* v. *Arnold*, 16 How. St. Tr. 695 (1724), for example, the jury charge descended straight from Bracton:

> "[I]t is not every kind of frantic humour or something unaccountable in a man's actions, that points him out to be such a madman as is to be exempted from punishment: it must be a man that is totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute, or a wild beast." *Id.*, at 764–765.

And the court offered an accompanying test linking that lack of reason to *mens rea*: If a man is "deprived of his reason, and consequently of his intention, he cannot be guilty." *Id.*, at 764; see *ibid.* (defining a "madman" as a "person that hath no design"); see also *Trial of William Walker* (Apr. 21, 1784), in 4 Old Bailey Proceedings 544, 547 (asking whether the defendant had a "distemper of mind which had deprived him of the use of his reason" or instead whether "he knew what he was doing [and] meant to do it"); *Beverley's Case*, 4 Co. Rep. 123b, 124b, 76 Eng. Rep. 1118, 1121 (K. B. 1603)

---

at 16–19. Some may well have viewed *mens rea* through a moral prism; but others emphasized cognitive understanding in using that term; and still others combined the moral and cognitive in diverse ways. Which is to say that the record is far more complicated than the dissent lets on, with jurists invoking, both within particular sources and across all of them, a variety of ways to resolve insanity claims. And under our long-established precedent, that motley sort of history cannot provide the basis for a successful due process claim.

(asking whether a man "is deprived of reason and understanding" and so "cannot have a felonious intent"). The House of Lords used much the same standard in *Rex* v. *Lord Ferrers*, 19 How. St. Tr. 886 (1760), when sitting in judgment on one of its members. There, the Solicitor General told the Lords to address "the capacity and intention of the noble prisoner." *Id.*, at 948. Relying heavily on Hale's treatise, he defined the legally insane as suffering from an "alienation of mind" and a "total[] want of reason." *Id.*, at 947. And in recapping the evidence on that issue, he asked about the defendant's intention: "Did [Ferrers] proceed with deliberation? Did he know the consequences" of his act? *Id.*, at 948.[9]

In such cases, even the language of morality mostly worked in service of the emphasis on cognition and *mens rea*. The idea was that if a defendant had such a "total[] want of reason" as to preclude moral thinking, he could not possibly have formed the needed criminal intent. *Id.*, at 947. Lord Chief Justice Mansfield put the point neatly in *Bellingham's Case*, 1 G. Collinson, Treatise on the Law Concerning Idiots, Lunatics, and Other Persons Non Compotes

---

[9] Even in the face of these instructions, the dissent claims that *Arnold* and *Ferrers* actually used the moral-incapacity test. See *post*, at 9–11. The assertion is based on some "good and evil" language (in *Ferrers*, mostly from witnesses) appearing in the case reports. But scholars generally agree, in line with our view, that *Arnold* and *Ferrers* "demonstrate how strictly" courts viewed "the criteria of insanity." 1 N. Walker, Crime and Insanity in England 53 (1968) (noting that the two decisions "have often been cited" for that proposition). Kahler himself does not dispute the point; indeed, he essentially concedes our reading. Rather than try to make the decisions say something they do not, he argues only that they were "outlier[s]" and "could hardly have been less typical." Brief for Petitioner 22, n. 5; Reply Brief 4 (internal quotation marks omitted). But that contrasting response fares no better. As even the dissent agrees, these were the "seminal" common-law decisions relating to insanity—indeed, two of only a small number in that period to make it into official reports. *Post*, at 9.

Mentis 636 (1812) (Collinson). He instructed the jury:

> "If a man were deprived of all power of reasoning, so as not to be able to distinguish whether it was right or wrong to commit the most wicked transaction, he could not certainly do an act against the law. Such a man, so destitute of all power of judgment, could have no intention at all." *Id.*, at 671.

On that account, moral incapacity was a byproduct of the kind of cognitive breakdown that precluded finding *mens rea*, rather than a self-sufficient test of insanity. See also *Rex* v. *Offord*, 5 Car. & P. 168, 169, 172 Eng. Rep. 924, 925 (N. P. 1831) ("express[ing] complete accordance in the observations of th[e] learned Judge" in *Bellingham*). Or said another way, a mentally ill defendant's inability to distinguish right from wrong, rather than independently producing an insanity acquittal, served as a sign—almost a kind of evidence—that the defendant lacked the needed criminal intent.

Other early common-law cases do not adopt the *mens rea* approach—but neither can they sustain Kahler's position. Kahler relies mainly on *Hadfield's Case*, 27 How. St. Tr. 1281 (1800), to show that common-law courts would acquit a mentally ill defendant who understood the nature of his act, but believed it moral. See Reply Brief 4. There, the defendant had deliberately set out to assassinate King George III on the view that doing so would bring about the Second Coming. See 27 How. St. Tr., at 1322. The judge instructed the jury that the defendant was so "deranged" as to make acquittal appropriate. *Id.*, at 1353. Maybe, as Kahler argues, that directive stemmed from the defendant's inability to tell right from wrong. But the judge never used that language, or stated any particular legal standard, so it is hard to know. Still other judges explained insanity to juries by throwing everything against the wall—mixing notions of cognitive incapacity, moral incapacity, and more,

without trying to order, prioritize, or even distinguish among them. See, *e.g.*, *Regina* v. *Oxford*, 9 Car. & P. 525, 545–548, 173 Eng. Rep. 941, 950 (N. P. 1840); *Trial of Francis Parr* (Jan. 15, 1787), in 2 Old Bailey Proceedings 228–229; *Bowler's Case*, 1 Collinson 674. Those decisions treat the inability to make moral judgments more as part of an all-things-considered assessment of legal insanity, and less as its very definition. But even if some of them belong in Kahler's corner, that would be far from enough. Taken as a whole, the common-law cases reveal no settled consensus favoring Kahler's preferred insanity rule. And without that, they cannot support his proposed constitutional baseline.

Only with *M'Naghten*, in 1843, did a court articulate, and momentum grow toward accepting, an insanity defense based independently on moral incapacity. See *Clark*, 548 U. S., at 749; *Leland*, 343 U. S., at 801; *supra*, at 2, 8. The *M'Naghten* test, as already described, found insanity in either of two circumstances. See *supra*, at 1–2. A defendant was acquitted if he "labour[ed] under such a defect of reason, from disease of the mind, [1] as not to know the nature and quality of the act he was doing; *or*, [2] if he did know it, that he did not know he was doing what was wrong." 10 Cl. & Fin., at 210, 8 Eng. Rep., at 722 (emphasis added). That test disaggregated the concepts of cognitive and moral incapacity, so that each served as a stand-alone defense. And its crisp two-part formulation proved influential, not only in Great Britain but in the United States too. Over the course of the 19th century, many States adopted the test, making it the most popular one in the country.

Still, *Clark* unhesitatingly declared: "History shows no deference to *M'Naghten* that could elevate its formula to the level of fundamental principle." 548 U. S., at 749. As *Clark* elaborated, even *M'Naghten* failed to unify state insanity defenses. See 548 U. S., at 749–752. States continued to experiment with insanity rules, reflecting what one court

called "the infinite variety of forms [of] insanity" and the
"difficult and perplexing" nature of the defense. *Roberts* v.
*State*, 3 Ga. 310, 328, 332 (1847). Some States in the 1800s
gravitated to the newly emergent "volitional incapacity"
standard, focusing on whether the defendant could at all
control his actions. *Clark*, 548 U. S., at 749; see, *e.g.*, *Roberts*, 3 Ga., at 331. One court viewed that inquiry as "much
more practical" than the "right and wrong test," which it
thought often "speculative and difficult of determination."
*State* v. *Felter*, 25 Iowa 67, 82, 84 (1868); see *Leland*, 343
U. S., at 801 (recognizing such skepticism about the moral-
incapacity test); *supra*, at 8–9. Another prophesied that the
volitional test was the one "towards which all the modern
authorities in this country[] are gradually but surely tend-
ing." *Parsons*, 81 Ala., at 586, 2 So., at 859. But that test,
too, failed to sweep all before it: State innovation proceeded
apace. See, *e.g.*, *State* v. *Pike*, 49 N. H. 399, 442 (1870) (ap-
plying the "product" test, which excuses a defendant whose
crime "was the offspring or product of mental disease");
N. D. Cent. Code Ann. §12.1–04.1–01(1)(a) (2012) (replac-
ing the right-from-wrong test with an inquiry into whether
the defendant's act arose from "[a] serious distortion of
[his] capacity to recognize reality"). Much as medical views
of mental illness changed as time passed, so too did legal
views of how to account for that illness when assigning
blame.

As earlier noted, even the States that adopted *M'Nagh-
ten* soon divided on what its second prong should mean.
See *supra*, at 2–3. Most began by asking, as Kahler does,
about a defendant's ability to grasp that his act was *im-
moral*. See, *e.g.*, *Wright* v. *State*, 4 Neb. 407, 409 (1876);
*State* v. *Spencer*, 21 N. J. L. 196, 201 (1846). Thus, *Clark*
labeled *M'Naghten*'s second prong a test of "moral capac-
ity," and invoked the oft-used phrase "telling right from
wrong" (or in older language, good from evil) to describe its
central inquiry. 548 U. S., at 747, 753; see *supra*, at 2. But

over the years, 16 States have reoriented the test to focus on the defendant's understanding that his act was *illegal*— that is, legally rather than morally "wrong."[10]  They thereby excluded from the ranks of the insane those who knew an act was criminal but still thought it right.

Contrary to Kahler's (and the dissent's) contention, that difference matters.  See Reply Brief 7 (claiming that "there is little daylight between these inquiries"); *post*, at 17, 21 (same).  The two tests will treat some, even though not all, defendants in opposite ways.  And the defendants they will treat differently are exactly those Kahler (and the dissent) focus on: those who know exactly what they are doing (including that it is against the law) but believe it morally justified—because, say, it is commanded by God (or in the dissent's case, a dog).  See Brief for Petitioner 15; *post*, at 20; *Schmidt*, 216 N. Y., at 339, 110 N. E., at 949.[11]  A famed

——————

[10] See *State* v. *Skaggs*, 120 Ariz. 467, 472, 586 P. 2d 1279, 1284 (1978); *Wallace* v. *State*, 766 So. 2d 364, 367 (Fla. App. 2000); *State* v. *Hamann*, 285 N. W. 2d 180, 184 (Iowa 1979); *Commonwealth* v. *Lawson*, 475 Mass. 806, 811, 62 N. E. 3d 22, 28 (2016); *State* v. *Worlock*, 117 N. J. 596, 610– 611, 569 A. 2d 1314, 1322 (1990); *People* v. *Wood*, 12 N. Y. 2d 69, 76, 187 N. E. 2d 116, 121–122 (1962); *State* v. *Carreiro*, 2013–Ohio–1103, 988 N. E. 2d 21, 27 (App.); *McElroy* v. *State*, 242 S. W. 883, 884 (Tenn. 1922); *McAfee* v. *State*, 467 S. W. 3d 622, 636 (Tex. Crim. App. 2015); *State* v. *Crenshaw*, 98 Wash. 2d 789, 794–795, 659 P. 2d 488, 492–493 (1983); Ark. Code Ann. §5–2–301(6) (2017); Ill. Comp. Stat., ch. 720, §5/6–2(a) (West 2016); Ky. Rev. Stat. Ann. §504.020(1) (West 2016); Md. Crim. Proc. Code Ann. §3–109(a) (2018); Ore. Rev. Stat. §161.295(1) (2019); Vt. Stat. Ann., Tit. 13, §4801(a)(1) (2019).

[11] The great judge (later Justice) whom the dissent cites to suggest there is no real difference between the legal wrong and moral wrong tests wrote a lengthy opinion whose point was the opposite.  Consider a case, Judge Cardozo said: "A mother kills her infant child to whom she has been devotedly attached.  She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice." *People* v. *Schmidt*, 216 N. Y. 324, 339, 110 N. E. 945, 949 (1915).  If the legal wrong test were used, Judge Cardozo continued, "it would be the duty of a jury to hold her responsible for the crime." *Ibid.*  But not if the focus

theorist of criminal law put the point this way:

> "A kills B knowing that he is killing B, and knowing
> that it is illegal to kill B, but under an insane delusion
> that the salvation of the human race will be obtained
> by . . . the murder of B[.]  A's act is a crime if the word
> 'wrong' [in *M'Naghten*] means illegal.  It is not a crime
> if the word wrong means morally wrong."  2 J. Stephen,
> History of the Criminal Law of England, ch. 19, p. 149
> (1883).

So constitutionalizing the moral-incapacity standard, as
Kahler requests, would require striking down not only the
five state laws like Kansas's (as the dissent at times sug-
gests, see *post*, at 16), but 16 others as well (as the dissent
eventually concedes is at least possible, see *post*, at 21).
And with what justification?  The emergence of *M'Nagh-
ten*'s legal variant, far from raising a due process problem,
merely confirms what *Clark* already recognized.  Even after
its articulation in *M'Naghten* (much less before), the moral-
incapacity test has never commanded the day.  *Clark*, 548
U. S., at 749.[12]

———————————
was, as in the original *M'Naghten* test, on moral wrong.  And that differ-
ence led the New York Court of Appeals to hold that the trial court's jury
instruction was in error.  See 216 N. Y., at 340, 110 N. E., at 950.  The
additional cases the dissent cites to downplay the distinction between
moral and legal wrong in fact follow *Schmidt* in recognizing when they
diverge.  See *Worlock*, 117 N. J., at 611, 569 A. 2d, at 1322 (explaining
that "the distinction between moral and legal wrong may be critical"
when, for example, a defendant "knowingly kill[s] another in obedience
to a command from God"); *Crenshaw*, 98 Wash. 2d, at 798, 659 P. 2d, at
494 (acknowledging *Schmidt*'s view that even when a defendant "knows
that the law and society condemn [her] act," she should not be held re-
sponsible if "her free will has been subsumed by her belief in [a] deific
decree").

[12] The diversity of American approaches to insanity is also evident in
the States' decisions about which kinds of mental illness can support the
defense.  See *Clark*, 548 U. S., at 750, n. 11; *supra*, at 3, n. 1.  Some States
limit the defense to those with a "severe" mental disease.  See, *e.g.*, Ala.

Indeed, just decades ago Congress gave serious consideration to adopting a *mens rea* approach like Kansas's as the federal insanity rule.  See *United States* v. *Pohlot*, 827 F. 2d 889, 899, and n. 9 (CA3 1987) (describing bipartisan support for that proposal).  The Department of Justice at the time favored that version of the insanity test.  Perhaps more surprisingly, the American Medical Association did too. And the American Psychiatric Association took no position one way or the other.  Although Congress chose in the end to adhere to the *M'Naghten* rule, the debate over the bill itself reveals continuing division over the proper scope of the insanity defense.

Nor is that surprising, given the nature of the inquiry.  As the American Psychiatric Association once noted, "insanity is a matter of some uncertainty."  Insanity Defense Work Group, Statement on the Insanity Defense, 140 Am. J. Psych. 681, 685 (1983).  Across both time and place, doctors and scientists have held many competing ideas about mental illness.  And that is only the half of it.  Formulating an insanity defense also involves choosing among theories of moral and legal culpability, themselves the subject of recurrent controversy.  At the juncture between those two spheres of conflict and change, small wonder there has not

—————

Code §13A–3–1 (2015).  Others prohibit its assertion by defendants with specific mental disorders.  See, *e.g.*, Ariz. Rev. Stat. Ann. §13–502 (2010) ("psychosexual" or "impulse control disorders"); Ore. Rev. Stat. §161.295(2) ("personality disorders").  In particular, many States follow the Model Penal Code in prohibiting psychopaths from raising the defense.  See ALI, Model Penal Code §4.01(2), p. 163 (1985); *e.g.*, Ind. Code §35–41–3–6(b) (2019) ("abnormality manifested only by repeated unlawful or otherwise antisocial conduct").  All those limitations apply even when the defendant's mental illness prevented him from recognizing that his crime was immoral.  In that way too, many States have departed from the principle that Kahler (along with the dissent) claims the Constitution commands.

been the stasis Kahler sees—with one version of the insanity defense entrenched for hundreds of years.

And it is not for the courts to insist on any single criterion going forward. We have made the point before, in *Leland*, *Powell*, and *Clark*. See *supra*, at 7–9. Just a brief reminder: "[F]ormulating a constitutional rule would reduce, if not eliminate, [the States'] fruitful experimentation, and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold." *Powell*, 392 U. S., at 536–537. Or again: In a sphere of "flux and disagreement," with "fodder for reasonable debate about what the cognate legal and medical tests should be," due process imposes no one view of legal insanity. *Clark*, 548 U. S., at 752–753. Defining the precise relationship between criminal culpability and mental illness involves examining the workings of the brain, the purposes of the criminal law, the ideas of free will and responsibility. It is a project demanding hard choices among values, in a context replete with uncertainty, even at a single moment in time. And it is a project, if any is, that should be open to revision over time, as new medical knowledge emerges and as legal and moral norms evolve. Which is all to say that it is a project for state governance, not constitutional law.

We therefore decline to require that Kansas adopt an insanity test turning on a defendant's ability to recognize that his crime was morally wrong. Contrary to Kahler's view, Kansas takes account of mental health at both trial and sentencing. It has just not adopted the particular insanity defense Kahler would like. That choice is for Kansas to make—and, if it wishes, to remake and remake again as the future unfolds. No insanity rule in this country's heritage or history was ever so settled as to tie a State's hands centuries later. For that reason, we affirm the judgment below.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

No. 18–6135

————

## JAMES K. KAHLER, PETITIONER *v.* KANSAS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[March 23, 2020]

JUSTICE BREYER, with whom JUSTICE GINSBURG and JUSTICE SOTOMAYOR join, dissenting.

Like the Court, I believe that the Constitution gives the States broad leeway to define state crimes and criminal procedures, including leeway to provide different definitions and standards related to the defense of insanity. But here, Kansas has not simply redefined the insanity defense. Rather, it has eliminated the core of a defense that has existed for centuries: that the defendant, *due to mental illness*, lacked the mental capacity necessary for his conduct to be considered morally blameworthy. Seven hundred years of Anglo-American legal history, together with basic principles long inherent in the nature of the criminal law itself, convince me that Kansas' law "'offends . . . principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Leland* v. *Oregon*, 343 U. S. 790, 798 (1952) (quoting *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934)).

I

A much-simplified example will help the reader understand the conceptual distinction that is central to this case. Consider two similar prosecutions for murder. In Prosecution One, the accused person has shot and killed another person. The evidence at trial proves that, as a result of severe mental illness, he thought the victim was a dog. Prosecution Two is similar but for one thing: The evidence at

trial proves that, as a result of severe mental illness, the defendant thought that a dog ordered him to kill the victim. Under the insanity defense as traditionally understood, the government cannot convict either defendant. Under Kansas' rule, it can convict the second but not the first.

To put the matter in more explicitly legal terms, consider the most famous statement of the traditional insanity defense, that contained in *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (H. L. 1843). Lord Chief Justice Tindal, speaking for a majority of the judges of the common-law courts, described the insanity defense as follows:

> "[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, [1] as not to know the nature and quality of the act he was doing; or, [2] if he did know it, that he did not know he was doing what was wrong." *Id.*, at 210, 8 Eng. Rep., at 722.

The first prong (sometimes referred to as "cognitive incapacity") asks whether the defendant knew what he was doing. This prong corresponds roughly to the modern concept of *mens rea* for many offenses. The second (sometimes referred to as "moral incapacity") goes further. It asks, even if the defendant knew what he was doing, did he have the capacity to know that it was wrong? Applying this test to my example, a court would find that both defendants successfully established an insanity defense. Prosecution One (he thought the victim was a dog) falls within *M'Naghten*'s first prong, while Prosecution Two (he thought the dog ordered him to do it) falls within its second prong.

In Kansas' early years of statehood, its courts recognized the *M'Naghten* test as the "cardinal rule of responsibility in the criminal law." *State* v. *Nixon*, 32 Kan. 205, 206, 4 P. 159, 160 (1884). Kansas "steadfastly adhered to that

test" for more than a century. *State* v. *Baker*, 249 Kan. 431, 449–450, 819 P. 2d 1173, 1187 (1991). But in 1995, Kansas "'legislatively abolish[ed] the insanity defense.'" *State* v. *Jorrick*, 269 Kan. 72, 82, 4 P. 3d 610, 617 (2000) (quoting Rosen, Insanity Denied: Abolition of the Insanity Defense in Kansas, 8 Kan. J. L. & Pub. Pol'y 253, 254–255 (1997)). Under the new provision, a criminal defendant's mental disease or defect is relevant to his guilt or innocence only insofar as it shows that he lacked the intent defined as an element of the offense, or *mens rea*. If the defendant acted with the required level of intent, then he has no defense based on mental illness. Kan. Stat. Ann. §21–5209 (2018 Cum. Supp.).

Under Kansas' changed law, the defendant in Prosecution One could defend against the charge by arguing that his mental illness prevented him from forming the mental state required for murder (intentional killing of a human being)—just as any defendant may attempt to rebut the State's prima facie case for guilt. The defendant in Prosecution Two has no defense. Because he acted with the requisite level of intent, he must be convicted regardless of any role his mental illness played in his conduct. See 307 Kan. 374, 401, 410 P. 3d 105, 125 (2018) (acknowledging that Kansas' *mens rea* approach "allows conviction of an individual who had no capacity to know that what he or she was doing was wrong").

I do not mean to suggest that *M'Naghten*'s particular approach to insanity is constitutionally required. As we have said, "[h]istory shows no deference to *M'Naghten*." *Clark* v. *Arizona*, 548 U. S. 735, 749 (2006). *M'Naghten*'s second prong is merely one way of describing something more fundamental. Its basic insight is that mental illness may so impair a person's mental capacities as to render him no more responsible for his actions than a young child or a wild animal. Such a person is not properly the subject of the criminal law. As I shall explain in the following section,

throughout history, the law has attempted to embody this principle in a variety of ways. As a historical matter, *M'Naghten* is by far its most prominent expression, but not its exclusive one. Other ways of capturing it may well emerge in the future. The problem with Kansas' law is that it excises this fundamental principle from its law entirely.

## II

The Due Process Clause protects those "'principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Leland*, 343 U. S., at 798. Our "primary guide" in determining whether a principle of justice ranks as fundamental is "historical practice." *Montana* v. *Egelhoff*, 518 U. S. 37, 43 (1996) (plurality opinion). The Court contends that the historical formulations of the insanity defense were so diverse, so contested, as to make it impossible to discern a unified principle that Kansas' approach offends. I disagree.

Few doctrines are as deeply rooted in our common-law heritage as the insanity defense. Although English and early American sources differ in their linguistic formulations of the legal test for insanity, with striking consistency, they all express the same underlying idea: A defendant who, due to mental illness, lacks sufficient mental capacity to be held morally responsible for his actions cannot be found guilty of a crime. This principle remained embedded in the law even as social mores shifted and medical understandings of mental illness evolved. Early American courts incorporated it into their jurisprudence. The States eventually codified it in their criminal laws. And to this day, the overwhelming majority of U. S. jurisdictions recognize insanity as an affirmative defense that excuses a defendant from criminal liability even where he was capable of forming the *mens rea* required for the offense. See Appendix, *infra*.

A

Consider the established common-law background of the insanity defense at and around the time the Framers wrote the Constitution. The four preeminent common-law jurists, Bracton, Coke, Hale, and Blackstone, each linked criminality to the presence of reason, free will, and moral understanding. It is "will and purpose," wrote Henry de Bracton in his 13th-century treatise, that "mark *maleficia* [misdeeds]." 2 Bracton On Laws and Customs of England 384 (S. Thorne transl. 1968) (Bracton); Oxford Latin Dictionary 1067 (P. Glare ed. 1982). A "madman," he explained, "can no more commit an *injuria* [unlawful conduct] or a felony than a brute animal, since they are not far removed from brutes." 2 Bracton 424; Oxford Latin Dictionary, at 914. Seizing on Bracton's reference to "brute animals" (sometimes translated "wild beasts"), the Court concludes that Bracton's approach, like Kansas', would excuse only those who lack capacity to form any intention at all. See *ante*, at 15. But what does it mean to be like a "brute animal"? A brute animal may well and readily intend to commit a violent act without being able to judge its moral nature. For example, when a lion stalks and kills its prey, though it acts intentionally, it does not offend against the criminal laws. See 2 Bracton 379 (noting that "murder" is defined as "by the hand of man" to "distinguish it from the case of those slain or devoured by beasts and animals which lack reason").

Bracton's other references to "madmen" shed further light on the meaning he attached to that term. Bracton described such persons as "without sense and reason" and "lack[ing] *animus*." *Id.*, at 324, 424. And he likened a "lunatic" to an "infant," who cannot be held liable in damages unless he "is capable of perceiving the wrongful character of his act." *Id.*, at 324; see also 4 *id.*, at 356 ("in many ways a minor and a madman are considered equals or not very different, because they lack reason" (footnote omitted)).

Thus, Bracton's "brute animal" included those who lacked
the qualities of reason and judgment that make human be-
ings responsible moral agents. See Platt, The Origins and
Development of the "Wild Beast" Concept of Mental Illness
and Its Relation to Theories of Criminal Responsibility, 1
Issues in Crim. 1, 6 (1965).

Leaving Bracton, let us turn to Sir Edward Coke, writing
in the early 17th century. Coke wrote that "the act and
wrong of a mad man shall not be imputed to him," not be-
cause he could not engage in intentional conduct (the equiv-
alent of the modern concept of *mens rea*), but because he
lacked something more—"mind or discretion." 2 Institutes
of the Laws of England §405, p. 247b (1628). Coke, like
Bracton before him, likened a "mad man" to an "[i]nfant,"
who could not be punished as a criminal "untill he be of the
age of fourteene, which in Law is accounted the age of dis-
cretion." *Ibid.* What is it that the "[i]nfant" lacks? Since
long before Coke's time, English jurists and scholars be-
lieved that it was the moral nature, not the physical nature,
of an act that a young child is unlikely to understand. See
Platt & Diamond, The Origins of the "Right and Wrong"
Test of Criminal Responsibility and Its Subsequent Devel-
opment in the United States: An Historical Survey, 54 Cal.
L. Rev. 1227, 1233–1234 (1966) (Platt & Diamond).

Sir Matthew Hale also premised criminal liability on the
presence of "understanding and liberty of will," without
which "there can be no transgression, or just reason to incur
the penalty or sanction that law instituted for the punish-
ment of the crimes or offenses." 1 Pleas of the Crown, ch. 2,
pp. 14–15 (1736). Hale, too, likened insane persons to "in-
fants" under the age of 14, who were subject to the criminal
laws only if they "had discretion to judge between good and
evil." *Id.*, ch. 3, at 26–27; *id.*, ch. 4, at 30 (a person who is
"labouring under melancholy distempers hath yet ordinar-
ily as great understanding, as ordinarily a child of fourteen
years hath, is such a person as may be guilty of treason or

felony"). Those suffering from "total insanity" could not be guilty of capital offenses, "for they have not the use of understanding, and act not as reasonable creatures, but their actions are in effect in the condition of brutes." *Id.*, at 30–32.

Sir William Blackstone, whose influence on the founding generation was the most profound, was yet more explicit. A criminal offense, he explained, requires both a "vitious will" and a "vitious act." 4 Commentaries on the Laws of England 21 (1769). Persons suffering from a "deficiency in will" arising from a "defective or vitiated understanding" were "not [criminally] chargeable for their own acts." *Id.*, at 24. Citing Coke, he explained that murder must be "committed by a person of sound memory and discretion" because a "lunatic or infant" is "incapable of committing any crime, unless in such cases where they shew a consciousness of doing wrong, and of course a discretion, or discernment, between good and evil." *Id.*, at 195–196. And he opined that deprivation of "the capacity of discerning right from wrong" is necessary "to form a legal excuse." *Id.*, at 189.

These four eminent jurists were not alone. Numerous other commentators expressly linked criminal liability with the accused's capacity for moral agency. William Lambard's 1581 treatise ranked a "mad man" as akin to a "childe" who had "no knowledge of good nor evil." Eirenarcha, ch. 21, p. 218. If such a person killed a man, that is "no felonious acte" because "they can[n]ot be said to have any understanding wil[l]." *Ibid.* But if "upon examination" it appeared that "they knew what they did, *[and] it was ill*, the[n] seemeth it to be otherwise." *Ibid.* (emphasis added). Michael Dalton's 1618 manual for justices of the peace instructed that "[i]f one that is *Non compos mentis* . . . kill a man, this is no felonie; for they have no knowledge of good and evill, nor can have a felonious intent, nor a will or mind to do harme." The Countrey Justice 215. William Hawkins,

in 1716, wrote that "those who," like "[l]unaticks," are "under a natural Disability of distinguishing between Good and Evil . . . are not punishable by any criminal Prosecution whatsoever." 1 Pleas of the Crown §1, p. 2; see also *id.*, at 1 ("The Guilt of offending against any Law whatsoever . . . can never justly be imputed to those who are either uncapable of understanding it, or of conforming themselves to it").

English treatises on the law of mental disability adopted the same view. George Collinson explained that "[t]o excuse a man in the commission of a crime, he must at the period when he committed the offense, have been wholly incapable of distinguishing between good and evil, or of comprehending the nature of what he is doing." Treatise on the Law Concerning Idiots, Lunatics, and Other Persons Non Compotes Mentis §7, p. 474 (1812) (Collinson); see also *id.*, §2, at 471 ("[A]n evil intention is implied in every offence, and constitutes the charge of every indictment: but a non compos, not having a will of his own, cannot have an intention morally good or bad; so that the overt act by which alone the motives of other men are discerned, with respect to him proves nothing"). Similarly, Leonard Shelford, summarizing English case law, wrote that "[t]he essence of a crime consists in the animus or intention of the person who commits it, considered as a free agent, and in a capacity of distinguishing between moral good and evil." Practical Treatise on the Law Concerning Lunatics, Idiots, and Persons of Unsound Mind 458 (1833) (emphasis deleted).

The majority believes that I am "cherry-pick[ing]" references to moral understanding while ignoring references to intent and *mens rea*. See *ante*, at 15–17, nn. 8, 9. With respect, I disagree. The Court points out, correctly, that many of the common-law sources state that the insane lack *mens rea* or felonious intent. But what did they mean by that? At common law, the term *mens rea* ordinarily incor-

porated the notion of "general moral blameworthiness" required for criminal punishment. Sayre, Mens Rea, 45 Harv. L. Rev. 974, 988 (1932); 3 Encyclopedia of Crime and Justice 995 (2d ed. 2002) (as used at common law, the term *mens rea* "is synonymous with a person's blameworthiness"). The modern meaning of *mens rea* is narrower and more technical. *Ibid.* It refers to the "state of mind or inattention that, together with its accompanying conduct, the criminal law defines as an offense." *Ibid.* When common-law writers speak of intent or *mens rea*, we cannot simply assume that they use those terms in the modern sense. That is an anachronism. Instead, we must examine the context to understand what meaning they ascribed to those terms. And when we do so, we see that, over and over again, they link criminal intent to the presence of free will and moral understanding. The Court dismisses those passages as just "some 'good and evil' language." *Ante*, at 17, n. 9. But it fails to explain why, if *mens rea* in the modern sense were sufficient, these common-law writers discuss the role of moral agency at all, much less why such language appears in virtually every treatise and virtually every case. In the Court's view, all that is just spilled ink.

The English case law illustrates this point. In the seminal case of *Rex* v. *Arnold*, 16 How. St. Tr. 695 (1724), the defendant stood accused of shooting Lord Onslow while laboring under the insane delusion that Onslow had bewitched him. *Id.*, at 699, 721. The Court emphasizes Justice Tracy's statement to the jury that if a man is "'deprived of his reason, and consequently of his intention, he cannot be guilty,'" concluding that the court adopted a modern *mens rea* test. *Ante*, at 16. But in the passage immediately preceding that statement, Justice Tracy explained that the defendant's intent to shoot was clearly proved, and that the only remaining question was whether his mental illness excused him from blame:

> "That he shot, and that wilfully [is proved]: but
> whether maliciously, that is the thing: that is the ques-
> tion; whether this man hath the use of his reason and
> sense?  If he was under the visitation of God, and could
> not distinguish between good and evil, and did not
> know what he did, though he committed the greatest
> offence, yet he could not be guilty of any offence against
> any law whatsoever; for guilt arises from the mind, and
> the wicked will and intention of the man.  If a man be
> *deprived of his reason, and consequently of his inten-
> tion, he cannot be guilty*; and if that be the case, though
> he had actually killed my lord Onslow, he is exempted
> from punishment."  16 How. St. Tr., at 764 (emphasis
> added; brackets in original).

See also *ibid.* (summarizing the testimony of one Mr. Coe,
who testified that he went to the defendant three days after
the shooting "and asked him, If he intended to kill my lord
Onslow?  and he said, Yes, to be sure").  On the next page,
Justice Tracy concluded that the jury must determine
whether the evidence "doth shew a man, who knew what he
was doing, and was able to distinguish whether he was do-
ing good or evil, and understood what he did."  *Id.*, at 765.

Likewise, in the case of *Rex* v. *Lord Ferrers*, 19 How. St.
Tr. 886 (1760), the solicitor general instructed the members
of the House of Lords to consider the "'capacity and inten-
tion'" of the accused, to be sure, *ante*, at 17, but what did he
mean by those terms?  The ultimate question of insanity,
he explained, depended on the defendant's capacity at the
time of the offense to distinguish right from wrong:

> "My lords, the question therefore must be asked; is the
> noble prisoner at the bar to be acquitted from the guilt
> of murder, on account of insanity?  It is not pretended
> to be a constant general insanity.  Was he under the
> power of it, at the time of the offence committed?  Could
> he, did he, at that time, distinguish between good and

evil?"  19 How. St. Tr., at 948.

In summation, the solicitor general argued that Lord Ferrers' own witnesses failed to provide any testimony "which proves his lunacy or insanity at any time." *Id.*, at 952. Reviewing the pertinent evidence, he noted that one witness testified that he "had observed great oddities in my lord," but acknowledged that he "never saw him in such a situation, as not to be capable of distinguishing between good and evil, and not to know, that murder was a great crime." *Ibid.* Another admitted under questioning by the Lords that "he thought lord Ferrers capable of distinguishing between moral and immoral actions." *Ibid.* The defendant's brother was the only witness to testify that "at particular times, the noble lord might not be able to distinguish between moral good and evil," but even he, the solicitor general argued, had been unable to testify to "any instance within his own recollection." *Id.*, at 953. If Lord Ferrers' bare intention to kill were sufficient to convict, why the extensive discussion of the evidence concerning his capacity for moral understanding?

These examples reflect the prevailing view of the law around the time of the founding. Judges regularly instructed juries that the defendant's criminal liability depended on his capacity for moral responsibility. See, *e.g.*, *Trial of Samuel Burt* (July 19, 1786), in 6 Old Bailey Proceedings 875 (E. Hodgson ed. 1788) (to acquit based on insanity, it must be shown that the mental disorder "takes away from the party all moral agency and accountability," and "destroys in them, for the time at least, all power of judging between right and wrong"); *Trial of Francis Parr* (Jan. 15, 1787), 2 *id.*, at 228 (jury must "judge whether at the moment of committing [the offense] he was not a moral agent, capable of discerning between good and evil, and of knowing the consequences of what he did"); *Bowler's Case*, 1 Collinson 673–674, n. (judge "concluded by observing to

the jury, that it was for them to determine whether the Prisoner, when he committed the offence with which he stood charged, was or was not incapable of distinguishing right from wrong"). The government's attorneys agreed that this was the proper inquiry. See, *e.g.*, *Parker's Case*, 1 *id.*, at 479–480 (the Attorney General argued that "the jury must be perfectly satisfied, that at the time when the crime was committed, the prisoner did not really know right from wrong").

In none of the common-law cases was the judge's reference to the defendant's capacity for moral agency simply a proxy for the narrow modern notion of *mens rea.* See *ante*, at 17. Something more was required. Consider *Bellingham's Case*, 1 Collinson 636. The defendant stood accused of the murder of Spencer Perceval, the Chancellor of the Exchequer, in the lobby of the House of Commons. *Ibid.* The Court emphasizes Chief Justice Mansfield's statement that one who could not distinguish right from wrong "'could have no intention at all,'" concluding that Chief Justice Mansfield viewed moral incapacity as a symptom of cognitive breakdown rather than a test of insanity. *Ante*, at 18. But, as in *Rex* v. *Arnold*, see *supra,* at 9–10, the defendant's intention to shoot Perceval was not seriously in dispute. 1 Collinson 670. Instead, his guilt or innocence turned on his capacity for moral blame. The "single question" for the jury, charged the Chief Justice, "was whether, when [the defendant] committed the offence charged upon him, he had sufficient understanding to distinguish good from evil, right from wrong, and that murder was a crime not only against the law of God, but against the law of his Country." *Id.*, at 673. Lord Lyndhurst, presiding over the case of *Rex* v. *Offord*, 5 Car. & P. 168, 172 Eng. Rep. 924 (N. P. 1831), certainly understood that inquiry to be the crux of Chief Justice Mansfield's charge. Citing *Bellingham's Case*, he instructed the jury that "[t]he question was, did [the accused] know that he was committing an offence against the

laws of God and nature?" 5 Car. & P., at 168, 172 Eng. Rep., at 925.

The Court dismisses other common-law cases as failing to articulate a clear legal standard. See *ante*, at 18–19. But these cases, too, required more than bare intent. In *Hadfield's Case*, 27 How. St. Tr. 1281 (1800), the defendant was acquitted after the prosecution conceded that he was "in a deranged state of mind" when he shot at King George III. *Id.*, at 1353. And in *Regina* v. *Oxford*, 9 Car. & P. 525, 173 Eng. Rep. 941 (N. P. 1840), the court observed that a "person may commit a criminal act, and yet not be responsible." *Id.*, at 546, 173 Eng. Rep., at 950. Although it acknowledged the difficulty of "lay[ing] down the rule of the English law on the subject," it summed up the inquiry as "whether the prisoner was labouring under that species of insanity which satisfies you that he was quite unaware of the nature, character, and consequences of the act he was committing, or, in other words, whether he was under the influence of a diseased mind, and was really unconscious at the time he was committing the act, that it was a crime." *Id.*, at 546–547, 173 Eng. Rep., at 950. Although these and other English cases discuss insanity in terms that are less precise than our modern taxonomy of mental states, their lesson is clear. To be guilty of a crime, the accused must have something more than bare ability to form intentions and carry them out.

### B

These fundamental principles of criminal responsibility were incorporated into American law from the early days of the Republic. Early American commentaries on the criminal law generally consisted of abridgments of the works of prominent English jurists. As early as 1792, one such abridgment instructed that "lunaticks, who are under a natural disability of distinguishing between good and evil are not punishable by any criminal prosecution." R. Burn,

Abridgment, or the American Justice 300; see also W. Stubbs, Crown Circuit Companion 288 (1 Am. ed. 1816) ("If one that is *non compos mentis* . . . kill a man, this is no felony; for they have not knowledge of good and evil, nor can have a felonious intent, nor a will or mind to do harm"). And an influential founding-era legal dictionary described the "general rule" that lunatics, "being by reason of their natural disabilities incapable of judging between good and evil, are punishable by no criminal prosecution whatsoever."    2 T. Cunningham, New and Complete Law Dictionary (2d corr. ed. 1771).  Similarly, the first comprehensive American text on forensic medicine, published in 1823, cited Chief Justice Mansfield's charge to the jury in *Bellingham's Case* for the proposition that "[s]o long as they could distinguish good from evil, so long would they be answerable for their conduct."  1 T. Beck, Elements of Medical Jurisprudence 369.  These principles, it concluded, "are doubtless correct, and conducive to the ends of justice."  *Id.*, at 370.

   Early American jurists closely hewed to these principles. In case after case, judges instructed juries that they must inquire into the defendant's capacity for moral understanding.  See, *e.g.*, *Meriam's Case*, 7 Mass. 168 (1810), 6 N. Y. City-Hall Recorder 162 (1822) (whether the defendant was "at the time, capable of distinguishing good from evil"); *Clark's Case*, 1 N. Y. City-Hall Recorder 176, 177 (1816) (same); *Ball's Case*, 2 N. Y. City-Hall Recorder 85, 86 (1817) (same); *United States* v. *Clarke*, 25 F. Cas. 454 (No. 14,811) (CC DC 1818) (whether defendant was "in such a state of mental insanity . . . as not to have been conscious of the moral turpitude of the act"); *Cornwell* v. *State*, 8 Tenn. 147, 155 (1827) (whether the prisoner "had not sufficient understanding to know right from wrong").

## C

   As the foregoing demonstrates, by the time the House of

Lords articulated the *M'Naghten* test in 1843, its "essential concept and phraseology" were "already ancient and thoroughly embedded in the law." Platt & Diamond 1258; see also 1 W. Russell, Crimes and Misdemeanors 8–14 (3d ed. 1843) (summarizing the pre-*M'Naghten* English case law and concluding that the key questions were whether "there be thought and design, a faculty to distinguish the nature of actions, [and] to discern the difference between moral good and evil"). Variations on the *M'Naghten* rules soon became the predominant standard in the existing states of the United States. Platt & Diamond 1257. That tradition has continued, almost without exception, to the present day.

It is true that, even following *M'Naghten*, States continued to experiment with different formulations of the insanity defense. See *ante*, at 19–20. Some adopted the volitional incapacity, or "irresistible-impulse," test. But those States understood that innovation to expand, not contract, the scope of the insanity defense, excusing not only defendants who met some variant of the traditional *M'Naghten* test but also those who understood that their conduct was wrong but were incapable of restraint. See, *e.g.*, *Parsons* v. *State*, 81 Ala. 577, 584–585, 2 So. 854, 858–859 (1887); *Bradley* v. *State*, 31 Ind. 492, 507–508 (1869); *State* v. *Felter*, 25 Iowa 67, 82–83 (1868); *Hopps* v. *People*, 31 Ill. 385, 391–392 (1863).

So too, the "offspring" or "product" test, which asks whether the defendant's conduct was attributable to mental disease or defect. The States that adopted this test did so out of the conviction that the *M'Naghten* test was too restrictive in its approach to assessing the accused's capacity for criminal responsibility. See *Durham* v. *United States*, 214 F. 2d 862, 874 (CADC 1954) ("We conclude that a broader test should be adopted"); *State* v. *Pike*, 49 N. H. 399, 441–442 (1870); see also Reid, Understanding the New Hampshire Doctrine of Criminal Insanity, 69 Yale L. J. 367,

386 (1960) ("[T]he New Hampshire doctrine . . . is more lib-
eral and has a wider range than *M'Naghten* rules"). Even
as States experimented with broader insanity rules, they
retained the core of the traditional common-law defense.

In the early 20th century, several States attempted to
break with that tradition. The high courts of those States
quickly struck down their restrictive laws. As one justice of
the Mississippi Supreme Court wrote in 1931: The "common
law proceeds upon an idea that before there can be a crime
there must be an intelligence capable of comprehending the
act prohibited, and the probable consequence of the act, and
that the act is wrong." *Sinclair* v. *State*, 161 Miss. 142, 158,
132 So. 581, 583 (Ethridge, J., concurring). Accordingly,
Justice Ethridge said, insanity "has always been a complete
defense to all crimes from the earliest ages of the common
law." *Ibid.*; *State* v. *Strasburg*, 60 Wash. 106, 116, 110 P.
1020, 1022–1023 (1910); cf. *State* v. *Lange*, 168 La. 958, 965,
123 So. 639, 642 (1929).

Today, 45 States, the Federal Government, and the Dis-
trict of Columbia continue to recognize an insanity defense
that retains some inquiry into the blameworthiness of the
accused. Seventeen States and the Federal Government
use variants of the *M'Naghten* test, with its alternative cog-
nitive and moral incapacity prongs. Three States have
adopted *M'Naghten* plus the volitional test. Ten States rec-
ognize a defense based on moral incapacity alone. Thirteen
States and the District of Columbia have adopted variants
of the Model Penal Code test, which combines volitional in-
capacity with an expanded version of moral incapacity. See
Appendix, *infra*. New Hampshire alone continues to use
the "product" test, asking whether "a mental disease or de-
fect caused the charged conduct." *State* v. *Fichera*, 153
N. H. 588, 593, 903 A. 2d 1030, 1035 (2006). This broad test
encompasses "'whether the defendant knew the difference
between right and wrong and whether the defendant acted

impulsively,'" as well as "'whether the defendant was suffering from delusions or hallucinations.'"  *State* v. *Cegelis*, 138 N. H. 249, 255, 638 A. 2d 783, 786 (1994).  And North Dakota uses a unique formulation that asks whether the defendant "lacks substantial capacity to comprehend the harmful nature or consequences of the conduct, or the conduct is the result of a loss or serious distortion of the individual's capacity to recognize reality."  N. D. Cent. Code Ann. §12.1–04.1–01(1) (2012).

Of the States that have adopted the *M'Naghten* or Model Penal Code tests, some interpret knowledge of wrongfulness to refer to moral wrong, whereas others hold that it means legal wrong.  See *ante*, at 2–3, 20–22.  While there is, of course, a logical distinction between those interpretations, there is no indication that it makes a meaningful difference in practice.  The two inquiries are closely related and excuse roughly the same universe of defendants.  See *State* v. *Worlock*, 117 N. J. 596, 609–611, 569 A. 2d 1314, 1321–1322 (1990) ("In most instances, legal wrong is coextensive with moral wrong"); *State* v. *Crenshaw*, 98 Wash. 2d 789, 799, 659 P. 2d 488, 494 (1983) (" '[S]ince by far the vast majority of cases in which insanity is pleaded as a defense to criminal prosecutions involves acts which are universally recognized as morally wicked as well as illegal, the hairsplitting distinction between legal and moral wrong need not be given much attention' "); *People* v. *Schmidt*, 216 N. Y. 324, 340, 110 N. E. 945, 949 (1915) (Cardozo, J.) ("Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals"); see also ALI, Model Penal Code §4.01, Explanatory Note, p. 164 (1985) (explaining that "few cases are likely to arise in which the variation will be determinative").

## III
### A

Consider the basic reason that underlies and explains this long legal tradition. That reason reveals that more is at stake than its duration alone. The tradition reflects the fact that a community's moral code informs its criminal law. As Henry Hart stated it, the very definition of crime is conduct that merits "a formal and solemn pronouncement of the moral condemnation of the community." The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401, 405 (1958).

The criminal law does not adopt, nor does it perfectly track, moral law. It is no defense simply to claim that one's criminal conduct was morally right. But the criminal law nonetheless tries in various ways to prevent the distance between criminal law and morality from becoming too great. In the words of Justice Holmes, a law that "punished conduct [that] would not be blameworthy in the average member of the community would be too severe for that community to bear." O. Holmes, The Common Law 50 (1881); see also *ibid.* ("[T]o deny that criminal liability . . . is founded on blameworthiness . . . would shock the moral sense of any civilized community").

Sometimes the criminal law seeks to keep its strictures roughly in line with the demands of morality through grants of discretion that will help it to reach appropriate results in individual cases, including special instances where the law points one way and morality the other. Thus, prosecutors need not prosecute. Jurors (however instructed) may decide to acquit. Judges may exercise the discretion the law allows them to impose a lenient sentence. Executives may grant clemency.

And sometimes the law attempts to maintain this balance by developing and retaining a "collection of interlocking and overlapping concepts," including defenses, that will help "assess the moral accountability of an individual for

his antisocial deeds." *Powell* v. *Texas*, 392 U. S. 514, 535–536 (1968) (plurality opinion). These concepts and defenses include "*actus reus*, *mens rea*, insanity, mistake, justification, and duress." *Id.*, at 536.

As we have recognized, the "process of adjustment" within and among these overlapping legal concepts "has always been thought to be the province of the States." *Ibid.* Matters of degree, specific content, and aptness of application all may be, and have always been, the subject of legal dispute. But the general purpose—to ensure a rough congruence between the criminal law and widely accepted moral sentiments—persists. To gravely undermine the insanity defense is to pose a significant obstacle to this basic objective.

The majority responds that Kansas has not removed the element of blameworthiness from its treatment of insanity; it has simply made a different judgment about what conduct is blameworthy. See *ante*, at 13, n. 7. That is not how the Kansas Supreme Court has characterized its law. See *State* v. *Bethel*, 275 Kan. 456, 472, 66 P. 3d 840, 850 (2003) (holding that Kansas law provides for "no consideration," at the guilt phase, "of whether wrongfulness was inherent in the defendant's intent"). In any event, as the Court acknowledges, the States' discretion in this area must be constrained within "broad limits," *ante*, at 7, which are derived from history and tradition. The question is whether Kansas' approach transgresses those limits. I doubt that the Court would declare, for example, that a State may do away with the defenses of duress or self-defense on the ground that, in its idiosyncratic judgment, they are not required. With respect to the defense of insanity, I believe that our history shows clearly that the criminal law has always required a higher degree of individual culpability than the modern concept of *mens rea*. See Part II, *supra.* And in my view, Kansas' departure from this long uniform tradition poses a serious problem.

B

To see why Kansas' departure is so serious, go back to our two simplified prosecutions: the first of the defendant who, because of serious mental illness, believes the victim is a dog; the second of a defendant who, because of serious mental illness, believes the dog commanded him to kill the victim. Now ask, what moral difference exists between the defendants in the two examples? Assuming equivalently convincing evidence of mental illness, I can find none at all. In both cases, the defendants differ from ordinary persons in ways that would lead most of us to say that they should not be held morally responsible for their acts. I cannot find one defendant more responsible than the other. And for centuries, neither has the law.

More than that, scholars who have studied this subject tell us that examples of the first kind are rare. See Brief for 290 Criminal Law and Mental Health Law Professors as *Amici Curiae* 12. Others repeat this claim. See Slobogin, An End to Insanity: Recasting the Role of Mental Disability in Criminal Cases, 86 Va. L. Rev. 1199, 1205 (2000); Morse, Mental Disorder and Criminal Law, 101 J. Crim. L. & C. 885, 933 (2011). That is because mental illness typically does not deprive individuals of the ability to form intent. Rather, it affects their *motivations* for forming such intent. Brief for 290 Criminal Law and Mental Health Law Professors as *Amici Curiae* 12. For example, the American Psychiatric Association tells us that individuals suffering from mental illness may experience delusions—erroneous perceptions of the outside world held with strong conviction. They may believe, incorrectly, that others are threatening them harm (persecutory delusions), that God has commanded them to engage in certain conduct (religious delusions), or that they or others are condemned to a life of suffering (depressive delusions). Brief for American Psychiatric Association et al. as *Amici Curiae* 25–26. Such delusions may, in some cases, lead the patient to behave

violently. *Id.*, at 28. But they likely would not interfere with his or her perception in such a way as to negate *mens rea*. See H. R. Rep. No. 98–577, p. 15 n. 23 (1984) ("Mental illness rarely, if ever, renders a person incapable of understanding what he or she is doing. Mental illness does not, for example, alter the perception of shooting a person to that of shooting a tree.").

Kansas' abolition of the second part of the *M'Naghten* test requires conviction of a broad swath of defendants who are obviously insane and would be adjudged not guilty under any traditional form of the defense. This result offends deeply entrenched and widely recognized moral principles underpinning our criminal laws. See, *e.g.*, National Comm'n on Reform of Fed. Crim. Laws, Final Report, Proposed New Fed. Crim. Code §503, pp. 40–41 (1971) (to attribute guilt to a "manifestly psychotic person" would "be immoral and inconsistent with the aim of a criminal code"); H. R. Rep. No. 98–577, at 7–8 ("[T]he abolition of the affirmative insanity defense would alter that fundamental basis of Anglo-American criminal law: the existence of moral culpability as a prerequisite for punishment"); ABA Criminal Justice Mental Health Standards §7–6.1, pp. 336–338 (1989) (rejecting the *mens rea* approach "out of hand" as "a jarring reversal of hundreds of years of moral and legal history" that "inhibits if not prevents the exercise of humane judgment that has distinguished our criminal law heritage").

By contrast, the rule adopted by some States that a defendant must be acquitted if he was unable to appreciate the *legal* wrongfulness of his acts, see *ante*, at 20–22, would likely lead to acquittal in the mine run of such cases. See *supra,* at 17. If that is so, then that rule would not pose the same due process problem as Kansas' approach. That issue is not before us, as Kansas' law does not provide even that protection to mentally ill defendants.

C

Kansas and the Solicitor General, in their efforts to justify Kansas' change, make four important arguments. First, they point to cases in this Court in which we have said that the States have broad leeway in shaping the insanity defense. See *Leland*, 343 U. S. 790; *Clark*, 548 U. S. 735. In *Leland*, we rejected the defendant's argument that the Constitution required the adoption of the "'irresistible impulse'" test. 343 U. S., at 800–801. Similarly, in *Clark*, we upheld Arizona's effort to eliminate the first part of the *M'Naghten* rule, applicable to defendants whose mental illness deprived them of the ability to know the "'nature and quality of the act,'" 548 U. S., at 747–748. If Arizona can eliminate the first prong of *M'Naghten*, Kansas asks, why can Kansas not eliminate the second part?

The answer to this question lies in the fact that Arizona, while amending the insanity provisions of its criminal code, did not in practice eliminate the traditional insanity defense in any significant part. See 548 U. S., at 752, n. 20 (reserving the question whether "the Constitution mandates an insanity defense"). As we pointed out, "cognitive incapacity is itself enough to demonstrate moral incapacity." *Id.*, at 753. Evidence that the defendant did not know what he was doing would also tend to establish that he did not know that it was wrong. *Id.*, at 753–754. And Prosecution One (he thought the victim was a dog) would still fail. The ability of the States to refuse to adopt other insanity tests, such as the "irresistible impulse" test or the "product of mental illness" test are also beside the point. See *Leland*, 343 U. S., at 800–801. Those tests both *expand* upon *M'Naghten*'s principles. Their elimination would cut the defense back to what it traditionally has been, not, as here, eliminate its very essence.

Second, the United States as *amicus curiae* suggests that the insanity defense is simply too difficult for juries to administer. Brief for United States as *Amicus Curiae* 12–13.

Without doubt, assessing the defendant's claim of insanity is difficult. That is one reason I believe that States must remain free to refine and redefine their insanity rules within broad bounds. But juries have been making that determination for centuries and continue to do so in 45 States. And I do not see how an administrative difficulty can justify abolishing the heart of the defense.

Third, Kansas argues that it has not abolished the insanity defense or any significant part of it. It has simply moved the stage at which a defendant can present the full range of mental-capacity evidence to sentencing. See Brief for Respondent 8; *ante*, at 4–5. But our tradition demands that an insane defendant should not be found guilty in the first place. Moreover, the relief that Kansas offers, in the form of sentencing discretion and the possibility of commitment in lieu of incarceration, is a matter of judicial discretion, not of right. See *State* v. *Maestas*, 298 Kan. 765, 316 P. 3d 724 (2014). The insane defendant is, under Kansas law, exposed to harsh criminal sanctions up to and including death. And Kansas' sentencing provisions do nothing to alleviate the stigma and the collateral consequences of a criminal conviction.

Finally, Kansas argues that the insane, provided they are capable of intentional action, are culpable and should be held liable for their antisocial conduct. Brief for Respondent 40. To say this, however, is simply to restate the conclusion for which Kansas argues in this case. It is a conclusion that in my view runs contrary to a legal tradition that embodies a fundamental precept of our criminal law and that stretches back, at least, to the origins of our Nation.

For these reasons, with respect, I dissent.

Appendix to the opinion of BREYER, J.

APPENDIX
M'Naghten

| State | Text |
|-------|------|
| Alabama | "It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts." Ala. Code §13A–3–1(a) (2015). |
| California | "In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." Cal. Penal Code Ann. §25(b) (West 2014). |
| Colorado | "(1) The applicable test of insanity shall be: "(a) A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable; except that care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives and kindred evil conditions, for, when the act is induced by any of these causes, the person is accountable to the law; or "(b) A person who suffered from a condition of mind caused by mental disease or defect that prevented the person from forming a culpable mental state that is an essential element of a crime charged, but care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives and kindred evil conditions because, when the act is induced by any of these causes, the person is accountable to the law." Colo. Rev. Stat. §16–8–101.5(1) (2019). |
| Florida | "(1) AFFIRMATIVE DEFENSE.—All persons are presumed to be sane. It is an affirmative defense to a criminal prosecution that, at the time of the commission of the acts constituting the offense, the defendant was insane. Insanity is established when: "(a) The defendant had a mental infirmity, disease, or defect; and "(b) Because of this condition, the defendant: |

Appendix to the opinion of BREYER, J.

| State | Text |
|---|---|
|  | "1. Did not know what he or she was doing or its consequences; or<br><br>"2. Although the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong.<br><br>"Mental infirmity, disease, or defect does not constitute a defense of insanity except as provided in this subsection." Fla. Stat. §775.027 (2018). |
| Iowa | "A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act." Iowa Code §701.4 (2016). |
| Minne-sota | "No person having a mental illness or cognitive impairment so as to be incapable of understanding the proceedings or making a defense shall be tried, sentenced, or punished for any crime; but the person shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from one of these causes, as not to know the nature of the act, or that it was wrong." Minn. Stat. §611.026 (2019). |
| Missis-sippi | "In determining sanity in criminal cases Mississippi utilizes the common law *M'Naghten* test. Under the *M'Naghten* test, the accused must be laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did not know it, that he did not know that what he was doing was wrong." *Parker* v. *State*, 273 So. 3d 695, 705–706 (Miss. 2019) (internal quotation marks and footnote omitted). |
| Missouri | "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he was incapable of knowing and appreciating the nature, quality or wrongfulness of his or her conduct." Mo. Rev. Stat. §562.086(1) (2016). |
| Nebraska | "Under our current common-law definition, the two requirements for the insanity defense are that (1) the defendant had a mental disease or defect at the time of the crime and (2) the defendant did not know or understand the nature and consequences of his or her actions or that he or she did not know the difference between right and wrong." *State* v. *Hotz*, 281 Neb. 260, 270, 795 N. W. 2d |

Appendix to the opinion of BREYER, J.

| State | Text |
|---|---|
| | 645, 653 (2011). |
| Nevada | "To qualify as being legally insane, a defendant must be in a delusional state such that he cannot know or understand the nature and capacity of his act, or his delusion must be such that he cannot appreciate the wrongfulness of his act, that is, that the act is not authorized by law." *Finger* v. *State*, 117 Nev. 548, 576, 27 P. 3d 66, 84–85 (2001). |
| New Jersey | "A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong." N. J. Stat. Ann. §2C:4–1 (West 2015). |
| New York | "In any prosecution for an offense, it is an affirmative defense that when the defendant engaged in the proscribed conduct, he lacked criminal responsibility by reason of mental disease or defect. Such lack of criminal responsibility means that at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity to know or appreciate either: <br> "1. The nature and consequences of such conduct; or <br> "2. That such conduct was wrong." N. Y. Penal Law Ann. §40.15 (West 2009). |
| North Carolina | "[A]n accused is legally insane and exempt from criminal responsibility by reason thereof if he commits an act which would otherwise be punishable as a crime, and at the time of so doing is laboring under such a defect of reason, from disease of the mind, as to be incapable of knowing the nature and quality of the act he is doing, or, if he does know this, incapable of distinguishing between right and wrong in relation to such act." *State* v. *Thompson*, 328 N. C. 477, 485–486, 402 S. E. 2d 386, 390 (1991). |
| Oklahoma | "Oklahoma uses the *M'Naghten* test to determine the issue of sanity at the time of the crime. This Court has held that the *M'Naghten* insanity test, as applied in Oklahoma, has two prongs. Under the first prong, the defendant is considered insane if he is suffering from a mental disability such that he does not know his acts are wrong and he is unable to distinguish right from wrong with respect to his acts. Under the second prong, the defendant is considered insane if suffering from a disability of reason or disease of the mind such that he does not understand the nature or consequences of his acts or omissions. The defendant need only satisfy one of these prongs in order to be found not guilty by reason of insanity." |

Appendix to the opinion of BREYER, J.

| State | Text |
|---|---|
| | *Cheney* v. *State*, 909 P. 2d 74, 90 (Okla. 1995) (footnotes omitted). |
| Pennsyl-vania | "Common law *M'Naghten*'s Rule preserved.—Nothing in this section shall be deemed to repeal or otherwise abro-gate the common law defense of insanity (*M'Naghten*'s Rule) in effect in this Commonwealth on the effective date of this section."  18 Pa. Cons. Stat. §314(d) (2015). |
| Tennes-see | "It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the of-fense, the defendant, as a result of a severe mental dis-ease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts."  Tenn. Code Ann. §39–11–501(a) (2018). |
| Washing-ton | "To establish the defense of insanity, it must be shown that:<br>    "(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:<br>    "(a) He or she was unable to perceive the nature and quality of the act with which he or she is charged; or<br>    "(b) He or she was unable to tell right from wrong with reference to the particular act charged." Wash. Rev. Code §9A.12.010 (2015). |
| Federal | "Affirmative Defense.—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts."  18 U. S. C. §17. |

## *M'Naghten* plus volitional incapacity

| State | Text |
|---|---|
| Georgia | "A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distin-guish between right and wrong in relation to such act, omission, or negligence." Ga. Code Ann. §16–3–2 (2019).<br>    "A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a de-lusional compulsion as to such act which overmastered his will to resist committing the crime."  §16–3–3. |
| New Mexico | "In order to support a verdict of insanity under the |

Appendix to the opinion of BREYER, J.

| State | Text |
| --- | --- |
|  | *M'Naghten* test, the jury must be satisfied that the defendant (1) did not know the nature and quality of the act or (2) did not know that it was wrong. This rule prevailed in New Mexico until 1954 when this court in *State* v. *White*, 56 N. M. 324, 270 P. 2d 727 (1954) made a careful analysis of the authorities and made a limited extension of the *M'Naghten* rule, adding a third ingredient. The court held that if the accused, (3) as a result of disease of the mind 'was incapable of preventing himself from committing' the crime, he could be adjudged insane and thereby relieved of legal responsibility for what would otherwise be a criminal act." *State* v. *Hartley*, 90 N. M. 488, 490, 565 P. 2d 658, 660 (1977). |
| Virginia | "As applied in Virginia, the defense of insanity provides that a defendant may prove that at the time of the commission of the act, he was suffering from a mental disease or defect such that he did not know the nature and quality of the act he was doing, or, if he did know it, he did not know what he was doing was wrong. . . . In addition, we have approved in appropriate cases the granting of an instruction defining an 'irresistible impulse' as a form of legal insanity. The irresistible impulse doctrine is applicable only to that class of cases where the accused is able to understand the nature and consequences of his act and knows it is wrong, but his mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act." *Orndorff* v. *Commonwealth*, 279 Va. 597, 601, n. 5, 691 S. E. 2d 177, 179, n. 5 (2010) (internal quotation marks and citations omitted). |

## Moral incapacity

| State | Text |
| --- | --- |
| Arizona | "A person may be found guilty except insane if at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong." Ariz. Rev. Stat. Ann. §13–502(A) (2010). |
| Delaware | "In any prosecution for an offense, it is an affirmative defense that, at the time of the conduct charged, as a result of mental illness or serious mental disorder, the accused lacked substantial capacity to appreciate the wrongfulness of the accused's conduct." Del. Code Ann., Tit. 11, §401(a) (2015). |
| Illinois | "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease |

Appendix to the opinion of BREYER, J.

| State | Text |
|---|---|
| | or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." Ill. Comp. Stat., ch. 720, §5/6–2(a) (West 2017). |
| Indiana | "A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense." Ind. Code §35–41–3–6(a) (2019). |
| Louisiana | "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." La. Rev. Stat. Ann. §14:14 (West 2016). |
| Maine | "A defendant is not criminally responsible by reason of insanity if, at the time of the criminal conduct, as a result of mental disease or defect, the defendant lacked substantial capacity to appreciate the wrongfulness of the criminal conduct." Me. Rev. Stat. Ann., Tit. 17, §39(1) (2006). |
| Ohio | "A person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." Ohio Rev. Code Ann. §2901.01(14) (Lexis 2014). |
| South Carolina | "It is an affirmative defense to a prosecution for a crime that, at the time of the commission of the act constituting the offense, the defendant, as a result of mental disease or defect, lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong." S. C. Code Ann. §17–24–10(A) (2014). |
| South Dakota | " 'Insanity,' the condition of a person temporarily or partially deprived of reason, upon proof that at the time of committing the act, the person was incapable of knowing its wrongfulness, but not including an abnormality manifested only by repeated unlawful or antisocial behavior." S. D. Codified Laws §22–1–2(20) (2017).<br><br>"Insanity is an affirmative defense to a prosecution for any criminal offense." §22–5–10. |
| Texas | "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code Ann. §8.01(a) (West 2011). |

Appendix to the opinion of BREYER, J.

## Model Penal Code

| State | Text |
|---|---|
| Arkansas | " 'Lack of criminal responsibility' means that due to a mental disease or defect a defendant lacked the capacity at the time of the alleged offense to either:<br>"(A) Appreciate the criminality of his or her conduct; or<br>"(B) Conform his or her conduct to the requirements of the law." Ark. Code Ann. §5–2–301(6) (Supp. 2019). |
| Connecti-cut | "In any prosecution for an offense, it shall be an affirm-ative defense that the defendant, at the time he commit-ted the proscribed act or acts, lacked substantial capac-ity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." Conn. Gen. Stat. §53a–13(a) (2017). |
| Hawaii | "A person is not responsible, under this Code, for con-duct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongful-ness of the person's conduct or to conform the person's conduct to the requirements of law." Haw. Rev. Stat. §704–400(1) (2014). |
| Kentucky | "A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental illness or intellectual disability, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ky. Rev. Stat. Ann. §504.020(1) (West 2016). |
| Maryland | "A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to:<br>"(1) appreciate the criminality of that conduct; or<br>"(2) conform that conduct to the requirements of law." Md. Crim. Proc. Code Ann. §3–109(a) (2018). |
| Massachu-setts | "1. Criminal responsibility. Where a defendant as-serts a defense of lack of criminal responsibility and there is evidence at trial that, viewed in the light most favorable to the defendant, would permit a reasonable finder of fact to have a reasonable doubt whether the de-fendant was criminally responsible at the time of the of-fense, the Commonwealth bears the burden of proving beyond a reasonable doubt that the defendant was crim- |

Appendix to the opinion of BREYER, J.

| State | Text |
|-------|------|
|  | inally responsible. In this process, we require the Commonwealth to prove negatives beyond a reasonable doubt: that the defendant did not have a mental disease or defect at the time of the crime and, if that is not disproved beyond a reasonable doubt, that no mental disease or defect caused the defendant to lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *Lawson*, 475 Mass. 806, 811, 62 N. E. 3d 22, 28 (2016) (internal quotation marks and citation omitted). |
| Michigan | "It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400 of the mental health code . . . that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." Mich. Comp. Laws Ann. §768.21a(1) (West 2000). |
| Oregon | "A person is guilty except for insanity if, as a result of a qualifying mental disorder at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law." Ore. Rev. Stat. §161.295(1) (2019). |
| Rhode Island | "A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness or his conduct or to conform his conduct to the requirements of the law were so substantially impaired that he cannot justly be held responsible." *State* v. *Carpio*, 43 A. 3d 1, 12, n. 10 (R. I. 2012) (internal quotation marks omitted). |
| Vermont | "The test when used as a defense in criminal cases shall be as follows:<br>    "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he or she lacks adequate capacity either to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law." Vt. Stat. Ann., Tit. 13, §4801(a) (2019). |
| West Virginia | "When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was |

Appendix to the opinion of BREYER, J.

| State | Text |
|---|---|
| | the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law." *State* v. *Fleming*, 237 W. Va. 44, 52–53, 784 S. E. 2d 743, 751–752 (2016). |
| Wisconsin | "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacked substantial capacity either to appreciate the wrongfulness of his or her conduct or conform his or her conduct to the requirements of law." Wis. Stat. §971.15(1) (2016). |
| Wyoming | "A person is not responsible for criminal conduct if at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." Wyo. Stat. Ann. §7–11–304(a) (2019). |
| District of Columbia | "A person is not responsible for criminal conduct if at the time of such conduct as a result of a mental disease or defect he lacked substantial capacity either to recognize the wrongfulness of his conduct or to conform his conduct to the requirements of the law." *Bethea* v. *United States*, 365 A. 2d 64, 79, n. 30 (D. C. 1976). |

## Unique formulation

| State | Text |
|---|---|
| New Hampshire | "A defendant asserting an insanity defense must prove two elements: first, that at the time he acted, he was suffering from a mental disease or defect; and, second, that a mental disease or defect caused his actions." *State* v. *Fichera*, 153 N. H. 588, 593, 903 A. 2d 1030, 1034 (2006). |
| North Dakota | "An individual is not criminally responsible for criminal conduct if, as a result of mental disease or defect existing at the time the conduct occurs:<br><br>"a. The individual lacks substantial capacity to comprehend the harmful nature or consequences of the conduct, or the conduct is the result of a loss or serious distortion of the individual's capacity to recognize reality; and<br><br>"b. It is an essential element of the crime charged that the individual act willfully." N. D. Cent. Code Ann. §12.1–04.1–01(1) (2012). |